**W. Russell VAN RIPER**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES.**

Civ. A. No. 81–4937.

United States District Court,
E.D. Pennsylvania.

April 21, 1982.

M. Patricia Carroll, Carroll & Carroll, Philadelphia, Pa., for plaintiff.

Joseph R. Davison, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This is an action by plaintiff, W. Russell Van Riper, to enjoin defendant, the Equitable Life Assurance Society of the United States ("Equitable") from rescinding a disability income policy of insurance issued to plaintiff. The action was originally filed in the Philadelphia Court of Common Pleas but was later removed to this court pursuant to 28 U.S.C. § 1441(a). Jurisdiction is based on diversity of citizenship.

In defense to this lawsuit, Equitable alleges that plaintiff failed to answer truthfully and fully questions on his insurance application which related to his past medical history thereby justifying a rescission of the policy. In addition, defendant counterclaimed to recover payments made to the plaintiff prior to the date of the policy's rescission. The case was tried to the court without a jury. This memorandum will set forth my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1. Plaintiff is a citizen of the Commonwealth of Pennsylvania. Defendant is a corporation, incorporated under the laws of the State of New York and has its principal place of business in New York.

2. Since September 1977, plaintiff was employed by the Graduate Hospital in Philadelphia, Pennsylvania as Director of Personnel. As part of his duties, he arranged for pensions and other benefits for the employees of the Hospital.

3. In early 1980, the management of the Hospital decided to purchase disability income insurance for certain executives of the Hospital, including the plaintiff. Plaintiff was therefore instructed to obtain information concerning the available policies and make arrangements for obtaining the insurance.

4. In the Spring of 1980, plaintiff was approached by Jack Schall, an agent of the defendant. Schall proposed that the Hospital purchase disability income policies from Equitable. He offered the policies on a "guaranteed to issue" basis which meant that each of the proposed insureds was guaranteed an insurance policy but that an individual insured may be issued a policy with exclusions for disability from certain causes or the premium rate for an individual may be higher because of certain conditions in that individual's medical background.

5. Plaintiff recommended to his superiors that the Hospital purchase the Disability Insurance Plan that was proposed by Mr. Schall and eventually the purchase was approved by the Board of Directors.

6. In the summer of 1980, the plaintiff, as well as other professional members of the staff of Graduate Hospital, applied for individual disability insurance policies with the Equitable.

7. Plaintiff's application for the policy of insurance consisted of two separate and distinct forms. The first of these forms pertains to the plaintiff's employment history, social background and his insurance experience. The second form relates to the plaintiff's past medical history.

8. This second form, identified as "Application Part 2", was completed on two different occasions. As an initial screening device, Jack Schall, the insurance agent, posed the questions on July 2, 1980 and completed the form on the basis of information supplied by the plaintiff.

9. Later, on August 13, 1980, Dr. Harvey L. Kaufman, a self-employed physician specializing in family practice in Cherry Hill, New Jersey and periodically hired by the Equitable and other insurance companies, performed a general medical checkup on Van Riper, and then sat down with him and asked him each question appearing on the medical history part of the application

form. Dr. Kaufman completed the form by recording plaintiff's responses which plaintiff then signed.

10. According to Mr. Schall and Dr. Kaufman, plaintiff's answers to the pertinent questions were as follows:

3. Has Proposed Insured ever been treated for or ever had any known indication of:

c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis or other chronic respiratory disease or disorder? . . . . *No.*

j. Allergies; anemia; other blood or lymph disease or disorder? . . . . *Yes.*

5. Has Proposed Insured:

b. Ever received counseling or treatment regarding the use of alcohol or drugs? . . . . *No.*

6. Other than as stated in answers to Questions 2–5, has Proposed Insured within the last 5 years:

b. Had any illness, injury or surgery? . . . . *No.*

c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? . . . . *No.*

11. The only past medical infirmity noted on the application was an episode of megaloblastic anemia in 1972, which plaintiff stated resulted in no sequelae. This is the only response which plaintiff gave in answering question 3(j).

12. In signing the application for insurance, plaintiff unconditionally subscribed to the following statement:

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement.

13. Relying on the information provided by plaintiff in his application for insurance, the Equitable issued a disability policy, without reservation, exception, or rate-up, to the plaintiff on August 25, 1980. The policy provided for a monthly payment in the amount of twelve hundred dollars during the duration of the disability or for the lifetime of the insured in the event of total disability.

14. In April 1981, plaintiff developed a duodenal ulcer which plaintiff claimed prevented him from engaging in meaningful employment. Plaintiff then filed a claim in August of 1981 with the defendant requesting payment of disability benefits.

15. Equitable made payments to the plaintiff in accordance with the policy of insurance for the three months prior to the notification. These payments totaled thirty-six hundred dollars in amount.

16. In the course of investigating plaintiff's claim for total disability, Equitable uncovered information which showed that answers allegedly given by plaintiff in response to questions posed by Mr. Schall and Dr. Kaufman were false.

17. Specifically, plaintiff had a history of alcoholism dating back to at least 1965. In fact, plaintiff had been hospitalized for that problem as recently as January of 1979 at Philadelphia's Graduate Hospital for four days. Upon his discharge from the Hospital, plaintiff was admitted to the Livingrin Rehabilitation Center for alcoholism for twenty-eight days.

18. Equitable's investigation also revealed that Mr. Van Riper had failed to disclose that he had been hospitalized in August 1978 at Graduate Hospital after he had experienced an episode of hemoptysis or "blood-spitting".

19. On the basis of this information Equitable gave notice of rescission of the insurance policy on October 9, 1981.

20. Mr. Van Riper has been actively involved in service organizations dedicated to the treatment of alcoholics and he has frequently spoken to the public on the subject.

## 30

### DISCUSSION

### I. Plaintiff's Action

 Under Pennsylvania law,[1] an insurer must establish three elements in order to void an insurance policy on the grounds of false and fraudulent representations. " 'These are: (1) the declaration must be false; (2) its subject matter must be material to the risk; and (3) the applicant must have known it to be false or must have made the statement in bad faith.' " *Lotman v. Security Mut. Life Ins. Co.,* 478 F.2d 868, 870 (3d Cir.1973) (quoting *Bremmer v. Protected Home Mut. Life Ins. Co.,* 218 Pa.Super.Ct. 364, 366, 280 A.2d 664, 665 (1971)); *Evans v. Penn Mut. Life Ins. Co.,* 322 Pa. 547, 560, 186 A. 133, 141 (1936). From the evidence presented at trial, I find that Equitable has satisfied all three of these elements.[2]

### A. The Falsity of the Declarations and Their Materiality

First, Van Riper's declarations that he was never treated for "blood spitting" or for "alcoholism" and that he did not have any illness or had not been treated at any

1. The parties agree that Pennsylvania law is to be applied to the substantive issues in the case.

2. Defendant argues that plaintiff's signature to the certification in the application of insurance that the answers appearing there were true and complete and could be relied upon by the defendant made the answers on the application "warranties" as opposed to merely "representations" and therefore Equitable must prevail regardless of any showing of materiality and bad faith or fraud on the part of the plaintiff. In the law of insurance, a "representation" is a statement by the insured, which would influence a prudent insurer in determining whether or not to accept the risk, or in fixing the amount of the premium in the event of such acceptance. R. Keeton, Basic Text on Insurance Law § 6.5(a) at 369–70 (1971). A "warranty" on the other hand, is a statement or promise set forth in the application by the insured "the untruth or nonfulfillment of which in any respect, and without reference to whether the insurer was in fact prejudiced by such untruth or nonfulfillment, renders the policy voidable by the insurer, wholly irrespective of the materiality of such statement or promise." *Id.* (quoting Vance, The Law of Insurance 408 (3d ed. Anderson 1951)).

"hospital clinic, sanatorium, or other medical facility" during the five years prior to his application were false. Indeed, the plaintiff conceded that his answers to the above questions on the Application for Insurance as recorded by Mr. Schall and Dr. Kaufman were untrue or incomplete but contends he was never asked these questions. Nonetheless, on cross-examination, Van Riper admitted that had these questions been propounded to him by Dr. Kaufman or Mr. Schall then his answers as presently recorded on his application would be incorrect:

Q. Assuming the doctor did ask you the question, "Have you ever received counseling or treatment regarding the use of alcohol," and you replied in response to the doctor's question no, would that reply in your mind be dishonest, sir?

A. Yes, it would.

Q. Assuming that the doctor asked you if you had been examined or treated at a hospital within the past five years, that would be from 1975 to 1980, and you had said no to that question, would you consider that answer to be incorrect, sir?

Because warranties are often harsh and unfair, see *Suravitz v. Prudential Ins. Co.,* 244 Pa. 582, 586, 91 A. 495, 496 (1914), the courts have uniformly held that "[a]nswers to questions ... in an application for insurance, unless they are clearly shown by the form of the contract to have been intended by both parties to be warranties ... are to be construed as representations ...." *Phoenix Life Ins. Co. v. Raddin,* 120 U.S. 183, 189, 7 S.Ct. 500, 502, 30 L.Ed. 644 (1887); 7 G. Couch, Cyclopedia of Insurance Law § 35:68 at 78 (2d ed. 1961). In the instant case, the policy or application does not clearly show that the parties intended the answers to the questions be warranties. Moreover, the Pennsylvania legislature has directed that all statements made by an applicant for a life, endowment, accident or health insurance policy be deemed to be representations and not warranties, Pa.Stat.Ann.Tit. 40, § 512a (Purdon 1971). *See also* Pa.Stat.Ann.Tit. 40, §§ 756.2, 756.3, 757 (Purdon 1971); 31 Pa.Code § 89.-12(d). Accordingly, I hold that the statements made by Van Riper in the application are representations, not warranties, and therefore defendant must prove all of the above three elements. *See Evans v. Penn Mut. Life Ins. Co.,* 322 Pa. 547, 186 A. 133 (1936).

A. I would consider that also to be incorrect, of course.

N.T. at 47.

█ The second element has also been proven by the defendant. Pennsylvania courts have held that false answers relating to the insured's prior treatment for alcoholism or for blood spitting are material to the risk as a matter of law. *Soltaniuk v. Metropolitan Life Ins. Co.*, 133 Pa.Super.Ct. 139, 2 A.2d 501 (1938) (alcoholism);[3] *Smith v. Northwestern Mut. Life Ins. Co.*, 196 Pa. 314, 46 A. 426 (1900) (spitting of blood).[4] Moreover, in the instant case, information concerning the insured's prior treatment at an asylum, hospital, sanatorium or other medical facility and inquiries regarding the insured's past treatment by a physician and past illnesses or ailments are material to the risk as a matter of law. *See e.g., Indovina v. Metropolitan Life Ins. Co.*, 334 Pa. 167, 5 A.2d 556 (1939); *Anastasio v. Metropolitan Life Ins. Co.*, 149 Pa.Super.Ct. 414, 27 A.2d 510 (1942); *Underwood v. Prudential Ins. Co.*, 241 Pa.Super.Ct. 27, 359 A.2d 422 (1976).

B. Knowledge of the Falsity of the Declarations

The third and final element that must be established by the defendant is that the plaintiff knew his answers to the questions on the application were false *or* that the plaintiff made the answers in bad faith. *Wolfson v. Mutual Life Ins. Co.*, 455 F.Supp. 82, 85 n. 3 (M.D.Pa.), *aff'd mem.*, 588 F.2d 825 (3d Cir.1978); *Evans v. Penn Mut. Life Ins. Co.*, 322 Pa. 547, 560, 186 A. 133, 141 (1936). The circumstances here are such that the plaintiff must have been aware of the falsity of the answers to the questions asked in Equitable's application.

Jack Schall, Equitable's agent, testified under oath that he asked Mr. Van Riper every question on the application concerning the plaintiff's past medical history, correctly recorded the same on the application, and that he heard Dr. Kaufman make the same inquiries. Dr. Kaufman testified that he could not recall asking each specific question, but that this was his regular practice when he examined an applicant for Equitable. In direct conflict with Schall's and Dr. Kaufman's testimony, Van Riper testified that these two men did not ask him all the questions on the application. He says if they had, then he would have answered them truthfully.

I find the testimony of Dr. Kaufman, which is corroborated by Schall's testimony, credible. Although there may be cause to doubt the candor of Mr. Schall's account of events since he is a full-time salesman for the defendant, there is no similar reason to question the truthfulness of Dr. Kaufman's testimony. Dr. Kaufman is self-employed as a practitioner in family medicine in Cherry Hill, New Jersey. He is also hired to perform physical examinations for numerous insurance companies, one of which is Equitable, but the record does not show that he depends on the defendant for a substantial portion of his livelihood.

Dr. Kaufman testified that he "always ask[s] all the questions" that are listed on Equitable's insurance application. Deposition at 33. Furthermore, Dr. Kaufman recorded a "Yes" answer to questions 3(j), 6(a) and 6(d) of Van Riper's application which related to the applicant's history of blood disorders, his prior treatment by physicians and previous medical tests performed on him. Dr. Kaufman then recorded details of the plaintiff's answers to these questions on a separate space provided on the application. The remaining questions

---

**3.** *Accord, Walsh v. Connecticut Mut. Life Ins. Co.*, 26 F.Supp. 566 (E.D.N.Y.1939); *Prudential Ins. Co. v. Gutowski*, 49 Del. 233, 113 A.2d 579 (1955); *Barrett v. Travelers Ins. Co.*, 52 App. Div.2d 897, 383 N.Y.S.2d 371 (1976); *Leigh v. Consumers Nat'l Life Ins. Co.*, 240 Or. 290, 401 P.2d 46 (1965); *Johnson v. New York Life Ins. Co.*, 165 S.C. 494, 164 S.E. 175 (1932); 1A J. Appleman, Insurance Law and Practice § 253 at 180–81 (1981).

**4.** *Accord, Murphy v. Prudential Ins. Co.*, 205 Pa. 444, 55 A. 19 (1903); *March v. Metropolitan Life Ins. Co.*, 186 Pa. 629, 40 A. 1100 (1898); *Arnold v. Metropolitan Life Ins. Co.*, 20 Pa.Super.Ct. 61 (1902); 1A J. Appleman, supra § 254, at 188–89.

were checked by the doctor as being answered "No." In view of these facts and in light of Dr. Kaufman's testimony that he *always* asked *all* the questions on Equitable's application, I find unbelievable plaintiff's assertion that Dr. Kaufman only asked a portion of the questions. There is no logical reason why Dr. Kaufman would ask only selected questions of Mr. Van Riper and fabricate answers to the questions on the application which he did not ask.[5]

Plaintiff has theorized that Jack Schall concocted answers to the questions on the application concerning Van Riper's medical history because he believed that if he could sell Van Riper insurance, then the plaintiff, as Director of Personnel at Graduate Hospital, would persuade his employer to purchase other disability policies from the Equitable. But even if this were correct, I am unable to ascribe similar motives to Dr. Kaufman. While Schall's testimony may be suspect because of his interest, it corroborates and is corroborated by Dr. Kaufman's testimony which I find is credible.

▮ It is undisputed that Van Riper had a history of chronic alcoholism dating back to 1965. He was hospitalized and treated for a period of thirty-two days for this affliction in January and February 1979. Also, he was actively involved in service organizations for alcoholics and has spoken frequently to the public on the subject. *See e.g.* Plaintiff's Exhibit No. 4. Van Riper also admitted that he was hospitalized for two days in 1978 for "blood spitting." In view of these significant experiences, I find that the plaintiff knew his answers were false when he twice said "No" to the questions (1) whether he "[e]ver received counseling or treatment regarding the use of alcohol or drugs?"; (2) whether he ever had any illness, injury or surgery or had been treated at a hospital, clinic, sanatorium or other medical facility within the last five years; and (3) whether he had any prior episode of "blood-spitting." *See* Questions Nos. 5(b), 6(b) and (c) and 3(c).[6]

## C. Bad Faith

▮ As an alternative holding, I also find that even if plaintiff did not know that his answers on his application were "false", he nonetheless made them in bad faith. At trial, plaintiff testified that he did not bother to read the application for insurance before he signed it, although by doing so, he unconditionally subscribed to the following statement:

> The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such

---

5. The testimony of plaintiff's witnesses, Jeffrey K. Stadnik, Ernest J. Ritacco, and Christopher R. D'Erasmo, employees at the Graduate Hospital who stated they had incorrect answers on their applications for disability insurance with the Equitable, does not at all impugn the testimony of Dr. Kaufman, although perhaps it places doubt upon the credibility of Mr. Schall. First, Stadnik and Ritacco could not recall the physician who examined them for the Equitable nor do their applications indicate who was the examining physician. See Plaintiff's Exhibits 9 and 10. D'Erasmo did say that Dr. Kaufman examined him, but his testimony indicates that any of the alleged inaccuracies on his application were not caused by Dr. Kaufman. See N.T. at 92–99.

6. The fact that Van Riper's present disability is unrelated to his concealed ailments of alcoholism and blood-spitting " 'is not controlling. The materiality of the statements went to the risk assumed, not to the loss incurred' ". *Woods v. Nat'l Life and Acc. Ins. Co.*, 380 F.2d 843, 848 n. 12 (3d Cir.1967) (quoting *Shafer v.*

*John Hancock Mut. Life Ins. Co.*, 410 Pa. 394, 400, 189 A.2d 234, 237 (1963)).

Van Riper testified that he advised Dr. Kaufman that Dr. Edward Gosfield, a physician at Graduate Hospital, performed tests on him during the last five years; that he had the plaintiff's medical records; and that anything Equitable wanted to know about his medical history, they could obtain from Dr. Gosfield. Plaintiff argues that Equitable should have contacted Dr. Gosfield to ascertain the plaintiff's prior health history and, because the defendant failed to do this, it should not be permitted to rescind the policy. Under Pennsylvania law, however, the Equitable had no duty to contact Dr. Gosfield or any other person concerning plaintiff's medical history. *See Shafer v. John Hancock Mut. Life Ins. Co.*, 410 Pa. 394, 400, 189 A.2d 234, 237 (1963). Furthermore, Van Riper's answers to the questions on the application indicated that inquiry of Dr. Gosfield was unnecessary. *See id.*

statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The Insurer may rely on them in acting on the application or making the policy change or reinstatement. Under Pennsylvania law, plaintiff's failure to read his answers to the questions before certifying to their accuracy constitutes "bad faith" and is fatal to his case. *Prevete v. Metropolitan Life Ins. Co.,* 343 Pa. 365, 22 A.2d 691 (1941).

In *Prevete,* the plaintiff-beneficiary of a life insurance policy issued to her husband admitted that, contrary to the answers in his application, her husband had suffered a serious back injury which had necessitated his hospitalization for five days and outpatient treatment for three months. At trial, the plaintiff offered evidence that showed that her husband had fully revealed this back injury and treatment at the time of his medical examination, but that the examining physician had recorded his answers incorrectly on the application.

On appeal, the Supreme Court of Pennsylvania held that the plaintiff's husband had signed the application certifying that the answers therein were "full, true and complete," and therefore the insurer was justified in rescinding the policy of insurance because of the bad faith of the insured. The court explained:

> In the present controversy, plaintiff admits that the answers in the application are false. Then, in view of insured's unqualified certification that he had read these false answers before signing the application, that they were correctly written as given by him, and that they were true and complete, how can it be said that he did not know the answers were false and did not deliberately intend to deceive the company? *In such a situation the necessary and inevitable conclusion is that insured did not act in good faith when he signed the application, and the policy should have been avoided without the intervention of a jury. His beneficiary should not have been heard to say that insured gave other answers than those set forth in the application. To permit such a thing would be to open wide the door to fraud.*

*Id.* at 368–69, 22 A.2d at 693. (emphasis added). The court made this holding despite finding that the statements of the insured were representations, and not warranties, and that the insured was a foreigner who, except for the ability to sign his name, could neither read nor write the English language. *Accord, Walsh v. John Hancock Mut. Life Ins. Co.,* 164 Pa.Super.Ct. 184, 63 A.2d 472 (1949); *Cypher v. National Accident and Health Ins. Co.,* 155 Pa.Super.Ct. 487, 38 A.2d 543 (1944); 3 G. Couch, Cyclopedia of Insurance Law § 26:120 at 635 (2d ed. 1960); Annot., 26 A.L.R.3d 6, 183–85 (1969).

In stark contrast to the level of education possessed by the insured in the *Prevete* case, Mr. Van Riper is an articulate and educated man. Nothing in the record shows that he was prevented from reading the application. He has served in responsible positions at various hospitals and he has assumed leadership roles in non-profit organizations dedicated to the treatment of alcoholism. I therefore conclude that Van Riper did not act in good faith when he attested to the correctness of his answers on the application without first reading them. Equitable was therefore justified in rescinding the policy of insurance.

## II. Defendant's Counterclaim

The defendant, after being notified by the plaintiff of the claimed disability, made payments to the plaintiff in the amount of thirty-six hundred dollars. These payments represented disability benefits under the policy for the months of the plaintiff's alleged disability up until the time the policy was rescinded by the defendant. Defendant has counterclaimed for repayment of these moneys.

 Under Pennsylvania law, an insurer may recover payments to the insured under a mistake of fact or as a result of fraud or misrepresentation. *Foster v. Federal Reserve Bank of Philadelphia,* 113 F.2d 326, 327–28 (3d Cir.1940); *Korpa v. Stuy-*

*vesant Ins. Co.,* 236 Pa.Super.Ct. 581, 586–87, 351 A.2d 682, 684–85 (1975); *Electric Ins. Co. v. Liney,* 69 Pa.D. & C.2d 495, 497–98 (C.P.Del.1975). Since I have found that the plaintiff obtained the insurance policy by his own fraudulent or wrongful conduct, Pennsylvania law dictates that he should not be permitted to retain the benefits paid under the policy prior to its rescission. Such payments constitute "simply a windfall to the . . . [plaintiff], a payment to which . . . [he] was not entitled and an unjust enrichment which in good conscience . . . [he] should not be permitted to keep." *Prudential Ins. Co. v. Nissley,* 65 Pa.D. & C.2d 582, 583–84 (C.P.Lanc.1974).

■ Plaintiff claims, however, that defendant should not prevail on its counterclaim because Equitable waived reimbursement of the amounts it paid to the plaintiff because in its rescission notice it did not demand the repayment of the sums it had previously paid to Van Riper. I find this argument to be without merit.

■ "To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it. . . ." *Brown v. City of Pittsburgh,* 409 Pa. 357, 360, 186 A.2d 399, 401 (1962). There is no evidence that Equitable clearly, unequivocally and decisively waived its right to repayment of the sums it paid to the plaintiff, nor it cannot be said that the defendant impliedly waived this right.

■ The "doctrine of implied waiver in Pennsylvania applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby . . . . " Id.* at 360–61, 186 A.2d at 401 (emphasis in original). Plaintiff has not shown that he was misled and prejudiced by the failure of the Equitable to state in its rescission letter that it was demanding repayment of the sums already paid to the plaintiff. Accordingly no waiver on the part of Equitable can be presumed or implied. Thus, the thirty-six

hundred dollars in policy benefits paid to the plaintiff should be returned to the defendant. Since defendant's counterclaim is in the nature of a restitution action, defendant is entitled to prejudgment interest at the legal rate of six percent of this sum from December 10, 1981, the date of the defendant's counterclaim, the first time the defendant demanded repayment of the policy benefits. *Peterson v. Crown Financial Corp.,* 661 F.2d 287 (3d Cir.1981).

Accordingly, the court arrives at the following:

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the subject matter and the parties by virtue of 28 U.S.C. § 1332 and 28 U.S.C. § 1441.

2. The plaintiff, in concealing information concerning his past medical history, when he applied for a policy of disability insurance with the defendant, acted in a fraudulent manner and in bad faith.

3. This concealed information was material to the risk which was assumed by the defendant.

4. Accordingly, the defendant was justified in rescinding the disability insurance policy issued to the plaintiff.

5. The defendant is legally entitled to be repaid by the plaintiff the amount of any benefits under the policy that were paid to the plaintiff by defendant prior to the rescission of the policy.

6. Accordingly, Equitable is entitled to judgments in its favor and against the plaintiff on plaintiff's complaint and on its counterclaim.

## CIVIL JUDGMENT

AND NOW, this 21st day of April, 1982, in accordance with the Memorandum of Decision of this date and the findings of fact and conclusions of law contained therein, it is hereby ORDERED that:

1. Judgment be and the same is hereby entered in favor of defendant, The Equitable Life Assurance Society of the United States, and against plaintiff, W. Russell Van Riper.

2. Judgment be and the same is hereby entered in favor of counter-plaintiff, The Equitable Life Assurance Society of the United States, and against counter-defendant, W. Russell Van Riper, in the amount of three thousand six hundred dollars ($3,600.00), with interest at the legal rate of six percent (6%) from December 10, 1981.